## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF NEW MEXICO

JEANNE PAHLS,
REBECCA WILSON,
ALMA ROSA SILVA BANUELOS,
CARTER BUNDY,
JASON CALL,
MARY LOU "MITZI" KRAFT,
MERIMEE MOFFITT,
LAURA LAWRENCE,
STUART T. "TERRY" RILEY,
CODEPINK WOMEN FOR PEACE, ALBUQUERQUE CHAPTER,
STOP THE WAR MACHINE,

       Plaintiffs,

v.                            No. Civ. 08-53 LH/ACT

BOARD OF COUNTY COMMISSIONERS
FOR THE COUNTY OF BERNALILLO,
BERNALILLO COUNTY SHERIFF'S DEPARTMENT,
CITY OF ALBUQUERQUE,
ALBUQUERQUE POLICE DEPARTMENT,
KERRY SHEEHAN, in his individual capacity,
MATTHEW THOMAS, in his individual capacity,
EDWARD MIMS, in his individual capacity,
LESLIE BROWN, in his individual capacity,
JOSHUA MCDONALD, in his individual capacity,

       Defendants.

## <u>MEMORANDUM OPINION AND ORDER</u>

On September 13, 2010, Defendant United States Secret Service Agent Kerry Sheehan filed a Motion for Summary Judgment based on Qualified Immunity (Doc. 132). Defendant Sheehan argues that he is entitled to summary judgment based on qualified immunity because the facts do not support Plaintiffs' assertions that he decided where protestors could and could not stand, and because all his decisions before and during the event were based on the security of the President and

the public, not on the content of Plaintiffs' speech or viewpoint.  On November 15, 2010, Defendants Matthew Thomas and Edward Mims of the Bernalillo County Sherriff's Department ("BCSD") filed a Motion for Summary Judgment (Doc. 141).  Defendants Thomas and Mims similarly argue that they did not discriminate against or disparately treat Plaintiffs based on their viewpoint in violation of their constitutional rights.  Plaintiffs subsequently filed a Motion for Leave to File Surreply in Opposition to Defendants Thomas and Mims' Motion for Summary Judgment (Doc. 151) to address the issue of the admissibility of the Declaration of Will Plotner, Jr., which Defendants Thomas and Mims raised for the first time in their reply brief.  The Court, having considered the motions, briefs, evidence, relevant law, and otherwise being fully advised, concludes that Plaintiffs' motion for leave to file the surreply should be granted and Defendants Sheehan's, Thomas's, and Mims's motions for summary judgment should be denied.

## I.    INTRODUCTION

This case arises from an August 27, 2007 visit by former President George W. Bush to Los Ranchos de Albuquerque, New Mexico, for a fund raiser at the home of Mayor Larry Abraham. Plaintiffs wished to express to President Bush their disagreement with his views as his motorcade passed by them on its way to the Mayor's home.  Plaintiffs allege, however, that Defendants forced them to demonstrate in an area at least 150 yards to the south of the Mayor's home, which was completely out of the President's view when his motorcade drove to the Mayor's home from the northern route.  In contrast, Plaintiffs contend that Defendants allowed a group of pro-Bush supporters to stand across from the Mayor's driveway in full view of the Presidential motorcade. Plaintiffs contend that the disparate treatment was based on the content and viewpoint of Plaintiffs' speech in violation of their First and Fourteenth Amendment rights.

## II.    FACTUAL BACKGROUND[1]

On August 27, 2007, former President George W. Bush attended a fund raiser for former Senator Pete Domenici at the Los Ranchos de Albuquerque home of Mayor Larry Abraham.  (Defs. Board of the County Commissioners for the County of Bernalillo and BCSD's Mem. in Supp. of Mot. for Summ. J. (hereinafter "County Defs.' Mem. (Doc. 94)"), Undisputed Fact ("UF") ¶ 1.)  The driveway to the Mayor's residence is located on the west side of Rio Grande Boulevard, a two-lane road that runs north and south through the town of Los Ranchos de Albuquerque.  (*Id.*, UF ¶ 10.) Rio Grande Boulevard, in the area near the driveway to the Mayor's residence, has tarmac shoulders as well as wide dirt shoulders on both sides of the road that can fit the width of a truck.  (Pls.' Mem. in Opp. to Bernalillo County Defs.' Mot. for Summ. J. (hereinafter "Pls.' Resp. to County Defs.' Mem. (Doc. 99)"), UF ¶ 41.)

Defendant Sheehan is a Special Agent with the United States Secret Service ("Secret Service"), and during all times material to this case, was serving in the Secret Service's Office of Protective Operations, Presidential Protective Division.  (Def. Sheehan's Mem. in Supp. of Mot. for Summ. J. based on Qualified Immunity (hereinafter "Def. Sheehan's Mem. (Doc. 133)"), UF ¶ 1.) Pursuant to 18 U.S.C. § 3056, the Secret Service is responsible for the protection of the President

---

[1]The following facts are undisputed or, if disputed with admissible evidence, are construed in the light most favorable to Plaintiffs, the non-moving party.  Many of the following facts are those the Court used in its Memorandum Opinion and Order (Doc. 124) in granting the Motion for Summary Judgment (Doc. 92) filed by Defendants Board of the County Commissioners for the County of Bernalillo and BCSD, who were dismissed from this case. The facts set forth in that opinion were not the Court's "findings," as described by Defendants. Rather, those facts were either undisputed or disputed but construed in Plaintiffs' favor when supported by the record.  Defendants Sheehan, Thomas, and Mims incorporate the facts as set forth in the Court's Memorandum Opinion and Order (Doc. 124) in their respective motions. Because those facts set forth by the Court were supported by the record, the Court has included those facts that Plaintiffs do not currently dispute with admissible evidence.

of the United States.  (*Id.*, UF ¶ 2.)  The Secret Service Presidential Protective Division works with other federal, state, and local agencies to design and implement security measures to ensure the President's safety.  (*Id.*)  As a member of that Division, securing the safety of the President is Special Agent Sheehan's primary job responsibility.  (Pls.' Opposition to Def. Sheehan's Mot. for Summ. J. (hereinafter "Pls.' Resp. to Def. Sheehan's Mem. (Doc. 136)"), UF ¶ 32.)

Before the President travels to a place, the Secret Service advance team visits the location to evaluate the necessary security measures and develop a site-specific security plan that accounts for a wide array of potential threats, including terrorist attacks, lone gunman, and chemical or biological attacks.  (Def. Sheehan's Mem. (Doc. 133), UF ¶ 3.)  The advance team also initiates or monitors security preparations and meets with law enforcement and other public safety officials that are involved in the overall protective effort.  (*Id.*)

A security plan includes strategies to prevent attacks and to respond to all types of emergencies.  (*Id.*, UF ¶ 4.)  One strategy the Secret Service uses is to establish a secure perimeter around the site.  (*Id.*)  The Secret Service and other law enforcement officers enforce the perimeter to ensure that only authorized individuals can access the secured area.  (*Id.*)  Another strategy is to control road access to the site.  (*Id.*, UF ¶ 5.)  Vehicle avenues of approach leading to the site are of particular concern, because they can serve as a means for potential attackers to deliver powerful, vehicle-borne explosive devices into secured areas.  (*Id.*)  To mitigate this risk, effective security plans frequently incorporate portions of roadways that bound a site.  (*Id.*, UF ¶ 6.)  Additionally, the movement of pedestrians and vehicles on roadways that are immediately adjacent to sites must be controlled to ensure that emergency vehicles have rapid, unobstructed access to the site.  (*Id.*)  Portions of Rio Grande Boulevard near the Mayor's driveway were identified as a vehicle access route.  (*Id.*, UF ¶ 15.)

4

Although the Secret Service does not have jurisdiction over a local police officer, its agents try to work as a team with local law enforcement officers.  (*See* Pls.' Resp. to County Defs.' Mem. (Doc. 99), Ex. G at 52.)  Sometimes local officers defer to the Secret Service, sometimes not.  (*See id.*)  Normally the Secret Service defers to local law enforcement on questions like where protestors are legally allowed to stand, because local law enforcement are more familiar with local codes, regulations, and laws, although the Secret Service has intervened at times in the placement of demonstrators for safety reasons.  (*See id.*, Ex. G at 83; County Defs.' Reply (Doc. 107), Ex. L at 46-47.)

Generally, the Secret Service allows members of the public to walk along the shoulder of a roadway if they are legally allowed to be there, if they are not interfering with the motorcade route, and if they do not pose a public safety risk.  (*See* Pls.' Resp. to County Defs.' Mem. (Doc. 99), Ex. G at 106-07.)  Citizens may be restricted from walking on a shoulder if there is a security issue or the possibility that one of the cars in the motorcade could hit them.  (*See id.*)  If an individual does not pose a direct threat and is standing on private property, then the Secret Service will do everything possible not to infringe on their constitutional rights.  (Defs. Matthew Thomas and Edward Mims' Mem. in Supp. of Mot. for Summ. J. (hereinafter "Defs.' Thomas and Mims' Mem. (Doc. 142)"), UF ¶ 30.)  If the Secret Service determines that an individual on private property poses a threat to the President, the Secret Service has the authority to move that individual regardless of whether he or she is on private or public property.  (Def. Sheehan's Mem. (Doc. 133), UF ¶ 10.)  Whether or not demonstrators are on private property, Secret Service policy prohibits agents from initiating certain actions with regard to demonstrators, absent some specific facts or observable actions that indicate the demonstrators pose a security threat to the President or the public.  (*Id.*, UF ¶ 29.)

Prior to the President's visit to Los Ranchos de Albuquerque, a meeting was held by the Secret Service with local law enforcement agencies including BCSD and the Albuquerque Police Department ("APD"). (County Defs.' Mem. (Doc. 94), UF ¶ 4.) BCSD asked APD to support them during the Presidential visit. (*See id.*, Ex. C at 10.) APD personnel generally take their direction from the Secret Service. (*See* Pls.' Resp. to Sheehan's Mot. (Doc. 136), Ex. G at 5.)

At this meeting, federal and local law enforcement planned for the Presidential visit. (*Id.*, UF ¶ 2.) Special Agent Sheehan participated in this meeting. (Def. Sheehan's Mem. (Doc. 133), UF ¶ 14.) The Secret Service was in charge of the overall security operation, decided where the inner and outer parameters were, and advised local law enforcement of what was or was not acceptable in connection with establishing the secure zone and/or perimeter. (*See* County Defs.' Mem., Ex. A at 17, 19 & Ex. D at 22; Pls.' Resp. to County Defs.' Mem. (Doc. 99), Ex. B at 36-37.) Local commanders were in charge of ensuring that their assignments were carried out correctly. (*See* County Defs.' Mem. (Doc. 94), Ex. D at 36-37.)

BCSD Sergeant Edward Mims was employed with BCSD as a supervisor for the Advanced Training Section and he worked as one of the supervisors for the Emergency Response Team ("ERT"). (Defs. Thomas and Mims' Mem. (Doc. 142), UF ¶¶ 16-17.) Sergeant Mims gave the morning briefing for the operation. (*See* Pls.' Mem. in Opposition to Defs. Thomas and Mims's Mot. for Summ. J. (hereinafter "Pls.' Resp. to Defs. Thomas & Mims' Mot. (Doc. 147)"), UF ¶ 61, Ex. C at 36-37, & Ex. D at 9.) During the briefing, "they" designated that all demonstrators would be to the south of the property. (*See* Pls.' Resp. to County Defs.' Mem. (Doc. 99), Ex. E at 29.) Officers were also instructed at the meeting to set up a perimeter and instructed not to allow anyone past the officers stationed at the perimeter. (*See id.*, Ex. J at 9.) After the meeting, Officer Juan Cabrera's understanding of the directive to keep all demonstrators south of the property meant that

6

a protestor who was invited by a property owner to protest on private property north of the barricade would not have been permitted to do so.  (*See id.*, Ex. M at 14-15.)

Special Agent Sheehan was responsible for the site security plan at the Mayor's residence. (*See* Defs.' Reply in Supp. of Mot. for Summ. J. ("County Defs.' Reply (Doc. 107)"), Ex. L at 38-39.)  He also was responsible for developing and implementing an overall security plan for the President's visit.  (Def. Sheehan's Mem. (Doc. 133), UF ¶ 13; Pls.' Resp. to Def. Sheehan's Mem. (Doc. 136), UF ¶ 33.)  No White House employee, Secret Service employee, or any other person directly or indirectly requested or instructed Special Agent Sheehan to designate a particular area where protestors or supporters would be located.  (Def. Sheehan's Mem. (Doc. 133), UF ¶ 18 & Ex. A ¶ 10.)

Special Agent Sheehan's direct, on-site responsibility on the day of the event was supervising and monitoring the secure perimeter at the Mayor's residence.  (*Id.*, UF ¶ 24.)  Rio Grande Boulevard and its shoulder were outside the portion of the secure perimeter, although portions of Rio Grande Boulevard were identified as a vehicle access route, so Special Agent Sheehan, in coordination with BCSD and APD personnel, put in place checkpoints, including the southern checkpoint, to restrict vehicle and pedestrian access to the roadway.  (*See* Def. Sheehan's Mem. (Doc. 133), Ex. A ¶ 8; Pls.' Resp. to Def. Sheehan's Mem. (Doc. 136), UF ¶ 40 & Ex. I at 80-83; Pls.' Resp. to Defs. Thomas and Mims' Mot. (Doc. 147), UF ¶ 58.)  BCSD and APD personnel were assigned to establish the perimeter at the event site in order to ensure security for the President. (County Defs.' Mem. (Doc. 94), UF ¶ 2.)

The southern checkpoint was established approximately 150 yards south of the Mayor's driveway on Rio Grande Boulevard.  (*See* Def. Sheehan's Mem. (Doc. 133), Ex. A ¶ 9.) The reasons for the selection of this location were that the checkpoint was far enough from the Mayor's driveway

to mitigate the impact of a vehicle borne explosive and the areas nearby were wide and flat enough to allow for emergency vehicle parking.  (*Id.*)  Both APD and BCSD officers were located at the southern perimeter line.  (*See* Pls.' Resp. to County Defs.' Mem. (Doc. 99), Ex. C at 36-37, Ex. I at 9-10, & Ex. K at 14-15.)  APD personnel were stationed at the southern checkpoint in order to observe and maintain order among the demonstrators.  (*See* Pls.' Resp. to Sheehan's Mot. (Doc. 136), Ex. G at 5.)  During the event, Special Agent Sheehan did not personally operate the checkpoint or direct the movement of pedestrians along Rio Grande Boulevard.  (*See* Def. Sheehan's Mem. (Doc. 133), Ex. A ¶ 11.)  Special Agent Sheehan had a golf cart that he used to get from one part of the site to the other parts to quickly check on things during the visit.  (*See* Pls.' Resp. to Sheehan's Mot. (Doc. 136), Ex. I at 98.)

Lt. Matthew Thomas was the ERT Commander and the S.W.A.T. Commander for BCSD at the time in question.  (*See* Pls.' Resp. to County Defs.' Mem. (Doc. 99), UF ¶ 35.)  BCSD was responsible for, and Lt. Thomas specifically was in charge of, maintaining site security within the overall guidelines and parameters set by the Secret Service.  (*See id.*, Ex. A at 13 & Ex. B at 36-37.)  Lt. Thomas, however, was not required to consult with the Secret Service about every decision concerning site security.  (*See id.*, Ex. A at 36-37.)  Lt. Thomas was in charge of making decisions regarding the treatment of demonstrators at the event, including determining where they would be permitted to be.  (Pls.' Resp. to Defs.' Thomas and Mims' Mot. (Doc. 147), UF ¶ 59.)  BCSD personnel were trained to direct demonstrators in such events to a designated protest zone because keeping them in one spot helps keep order, prevents interference with the motorcade, and helps ensure the safety of the President.  (*See* Defs. Thomas and Mims' Mem. (Doc. 142), Ex. E at 12-13.)

David Linthicum is the Chief Deputy for BCSD.  (Pls.' Resp. to County Defs.' Mem. (Doc. 99), UF ¶ 34.)  Securing the safety of presidents and other high level government officials at events

falls within the purview of his work as the Chief Deputy.  (*Id.*)  Chief Deputy Linthicum's role for the August 27, 2007 event was to make sure that staffing and resources were adequate, but he was not present at the event.  (County Defs.' Reply (Doc. 107), Ex. O at 6-7, 14-15.)  According to Chief Deputy Linthicum, the decision as to where BCSD permits demonstrators to stand depends on the particulars of each event, such as the number of demonstrators, who is involved, available resources, and any known threats.  (*See* Pls.' Resp. to County Defs.' Mem. (Doc. 99), Ex. F at 16-18, 26.) Chief Deputy Linthicum asserts that political viewpoint is not supposed to be a factor that determines where protestors stand, unless there are specific threats known from a particular group. (*See id.*, Ex. F at 17-18.)  BCSD has no generalized rule for how to resolve disagreements between its officers and the Secret Service over the placement of protestors.  (*See id.*, Ex. F at 25-26.)  BCSD vests discretion with one person present at the event to make decisions on its behalf regarding the treatment of protestors.  (*See id.*, Ex. F at 22-23.)  At the August 27, 2007 event, Lt. Thomas was in charge of making decisions for BCSD.  (*See id.*, Ex. A at 13, Ex. B at 36-37, & Ex. F at 22-23, 33.)  Although the Secret Service in general makes the ultimate decision as to the removal of demonstrators, if BCSD did not concur in what was going on, it could pull its officers out of the event.  (*See id.*, Ex. F at 33.)  The Secret Service has more authority over Presidential visits than does BCSD.  (Pls.' Resp. to Sheehan's Mem. (Doc. 136), UF ¶ 38 & Ex. F at 35.)

On the day of the event, Sgt. Mims was tasked as the ERT sergeant and his primary responsibility was the security of the outer perimeter.  (Defs. Thomas and Mims' Mem. (Doc. 142), UF ¶ 18.)  Sgt. Mims made assignments as to where his deputies would be positioned on the outer perimeter.  (*Id.*, UF ¶ 19.)  He sent his BCSD details out to the various perimeter points, including the southern checkpoint on Rio Grande Boulevard, and he physically checked each part of the outer perimeter.  (*See* Pls.' Resp. to County Defs.' Mem. (Doc. 99), Ex. D at 19-21, 30.)  Sgt. Mims had

authority to decide whether to let demonstrators through the perimeter.  (Pls.' Resp. to Defs. Thomas and Mims' Mem. (Doc. 147), UF ¶ 62.)  For example, if asked by an officer whether or not to allow a person through the checkpoint before the perimeter "hardened,"[2] Sgt. Mims had authority to allow or disallow persons through the checkpoint, and if he had a question, according to the chain of command, he was to consult Lt. Thomas.  (*See* Pls.' Resp. to County Defs.' Mem. (Doc. 99), Ex. A at 36-37; Pls.' Resp. to Defs. Thomas and Mims' Mot. (Doc. 147), Ex. A at 50-52.)

During the August 27, 2007 Presidential visit, various protestors, including the individually named plaintiffs and peace organization plaintiffs, were present.  (County Defs.' Mem. (Doc. 94), UF ¶ 11.)  The protestors came as a peaceful way of showing the President that not all Americans shared his views, particularly those on the Iraq War.  (*See id.*, UF ¶ 12; Pls.' Resp. to County Defs.' Mem. (Doc. 99), UF ¶ 43.)  The protestors carried various signs expressing their disapproval of the President, including signs reading: "Good Riddance to Gonzales.  Who's next?  Bush, I Hope" and "Peace Takes Work, War Takes Lives."  (County Defs.' Mem. (Doc. 94), UF ¶ 13.)  Members of CODEPINK held up pink peace symbols, as well as signs that read, "Walk in their [soldiers] Shoes" and "Delete Him [Bush]."  (*Id.*)  Plaintiff Jason Call wore a t-shirt that read, "Bush is an International Terrorist," and he held signs reading: "Honk to Impeach Bush-Cheney," "Defend the Constitution – Impeach Bush," and "War, Famine, Pestilence, Death" with pictures of President Bush, Vice-President Dick Cheney, Secretary Condoleeza Rice, and Secretary Donald Rumsfeld underneath.  (*See id.*)

Prior to the August 27, 2007 event, BCSD Lt. John McCauley spoke with Plaintiff Jeanne

---

[2]The "hardening" of the perimeter refers to the time shortly before the President's arrival when law enforcement personnel blocked Rio Grande Boulevard with vehicles and no longer allowed vehicular or pedestrian traffic through the checkpoints and other barricades.  (*See* Defs.' Thomas and Mims' Mem. (Doc. 142), UF ¶¶ 45-47.)

Pahls about where people could protest during the visit. (*See* County Defs.' Mem. (Doc. 94), Ex. D at 21 & Pls.' Resp. to County Defs.' Mem. (Doc. 99), Pahls Decl. ¶ 9.) Lt. McCauley advised that he did not know the President's motorcade route and that the police did not intend to allow people to protest directly across the street from the Mayor's residence. (*See* Pls.' Resp. to County Defs.' Mem. (Doc. 99), Pahls Decl. ¶ 9.) He also informed her that if there were any public areas then they could demonstrate there, but that for private property, they would need to have the permission of the property owner. (*See* County Defs.' Mem. (Doc. 94), Ex. D at 21-22.)

On the day of the event, a large group of protestors gathered on Rio Grande Boulevard approximately 150 yards to the south of the Mayor's driveway. (*See* County Defs.' Reply (Doc. 107), Ex. N at 27-28; Am. Compl. ¶¶ 1, 32.) Most of these protestors to the south were on or near the roadway on public property. (*See* County Defs.' Mem. (Doc. 94), Ex. C at 53.) Law enforcement had no reason to believe that Plaintiffs and the other demonstrators posed any security risks to the President or to the event. (Pls.' Resp. to County Defs.' Mem. (Doc. 99), Ex. A at 56, Ex. D at 52-53, & Ex. G at 119.)

Lt. Thomas ordered the officers under his command to allow the demonstrators to go where they wanted to go, but to keep them all in one group. (*See* County Defs.' Mem. (Doc. 94), Ex. A at 58-60.) Lt. Thomas wanted the anti-Bush protesters to be in one group because he was concerned about having an accident on the roadway, especially in light of the fact that the manpower of his department was depleted due to so many officers having to help with Presidential security. (*See id.*; Defs.' Thomas and Mims' Mem. (Doc. 142), Ex. C at 59-60.) There were, however, some officers who were in a staging area in an empty field and in a dirt lot in close proximity to the event in case they were needed, but they basically sat around, passing time in different ways. (*See* Pls.' Resp. to Defs.' Thomas and Mims' Mot. (Doc. 147), Ex. I at 4, 10-11; Ex. J at 47-48; & Ex. K at 5, 7-8.)

11

Sgt. Mims, when he began to see demonstrators show up on the south and north sides of the perimeter, gave instructions that, because the bulk of protestors were arriving to the south, that the south side was a good place for those individuals to be.  (*See* Pls.' Resp. to Defs.' Thomas and Mims' Mot. (Doc. 147), Ex. E at 30-31, 34-35.)  Residents, however, were permitted to stay inside the perimeter.  (Defs. Thomas and Mims' Mem. (Doc. 142), UF ¶ 28.)

APD Lt. Les Brown, following Lt. Thomas's directive to keep protestors south of the driveway, told protestors to stay south of the Mayor's driveway.  (*See* Pls.' Resp. to County Defs.' Mem. (Doc. 99), Ex. C at 36-37.)  When Lt. Brown had a question as to whether to let certain people through the line, he would call Lt. Thomas.  (*See* Pls.' Resp. to Def. Sheehan's Mem. (Doc. 136), Ex. D at 20.)  Lt. Brown considered BCSD to be basically in control of the event; however, during the motorcade, he considered APD to be in charge because APD had most of the manpower.  (*See* Pls.' Resp. to County Defs.' Mem. (Doc. 99), Ex. C at 11.)

APD Sergeant Joshua McDonald was assigned to the south end of the Rio Grande perimeter by either Lt. Thomas or Sgt. Mims.  (*See id.*, Ex. I at 9-10.)  Two Secret Service agents came by in a golf cart and told Sgt. McDonald not to let any pedestrian traffic head north past his line, which was a driveway.[3]  (*See* Pls.' Resp. to Def. Sheehan's Mot. (Doc. 136), Ex. A at 9-10, 12-13.)  Officer Pat Ficke was stationed south of the Mayor's house.  (*Id.*, Ex. B at 7-8.)  Two Secret Service agents in a golf cart also approached Officer Ficke and told him that the protestors were located in a good place there and not to allow them any farther north on the road.  (*Id.*)

_____

[3]The two Secret Service agents who issued the directive are not identified.  Although Special Agent Sheehan was driving a golf cart that day, based on the record before the Court, the evidence does not show that Special Agent Sheehan was one of the Secret Service agents personally telling APD officers at the southern checkpoint to stop pedestrians from walking north of the southern checkpoint.

When motor vehicle operators attempted to park on the side of the road prior to the President's arrival, they were asked by local law enforcement personnel to proceed along Rio Grande Boulevard.  (Defs.' Thomas and Mims Mem. (Doc. 142), UF ¶ 41.)  Law enforcement personnel were generally concerned about the potential threat associated with vehicles parking along the roadway and potentially being loaded with explosives, weaponry, or any other threat to the President or danger to the public.  (*See id.*, Ex. H at 44-45.)

When Plaintiff Carter Bundy arrived at the scene to demonstrate, he asked some BCSD officers how close he and other demonstrators could gather as a group.  (*See* Pls.' Resp. to County Defs.' Mem. (Doc. 99), Ex. K at 14-15, 17.)  The BCSD officers told them they could gather at the cross street south of the Mayor's residence, which was nearly around the bend from the line of sight of the Mayor's driveway, about 300 yards away.  *(See id.)*

Plaintiff Merimee Moffitt arrived near the Mayor's residence between 9:30 and 10:00 a.m. on August 27, 2007, with about 12 to 15 members of CODEPINK.  (*Id.*, Moffitt Decl. ¶ 5.)  They stood where the majority of people were gathered, on the shoulder of Rio Grande Boulevard south of the Mayor's driveway.  (*Id.*)  At one point, Ms. Moffitt started walking north to determine whether she could stand closer to the Mayor's driveway, but she turned back after protestors from the north told her that they were not permitted to stand north of where they were.  (*Id.*, Moffitt Decl. ¶ 6.)  Shortly after Ms. Moffitt rejoined the group of protestors, a white van drove past and backed into a private driveway off of Rio Grande Boulevard.  (*Id.*, Moffitt Decl. ¶ 7.)  A woman in the van announced that she was there to take them north on Rio Grande Boulevard, closer to the motorcade, where they could be seen from private property.  (*Id.*, Moffitt Decl. ¶ 8.)  As protestors began to take advantage of the offer, an unnamed BCSD officer appeared and told the woman in the van that she could not park there.  (*Id.*, Moffitt Decl. ¶¶ 9-10.)  The woman in the van explained that she was not

13

parking, rather, she was picking people up to take them to a friend's private property to the north. (*Id.*, Moffitt Decl. ¶ 11.)  The officer told her that none of the other protestors could go up north and that no one, other than she and her daughter, could go with her.  (*Id.*, Moffitt Decl. ¶ 12.)  Although one person had already gotten in the van and another person was stepping into the van, they both exited the van and the woman driving the van left according to the officer's orders.  (*Id.*, Moffitt Decl. ¶ 13.)

Plaintiff Pahls arrived at the event site between 8:00 and 8:30 a.m.  (*Id.*, Pahls Decl. ¶ 10.) Ms. Pahls initially walked back and forth across the street from the Mayor's driveway. (*Id.*)  A BCSD officer approached her and asked what she was doing there, to which she replied that she was looking for a place to stand and protest.  (*Id.*, Pahls Decl. ¶ 13.)  The BCSD officer informed her that people would be allowed to gather on the shoulders of Rio Grande Boulevard either north or south of a certain distance from the Mayor's driveway.  (*Id.*)  Ms. Pahls then decided to stand to the north of the Mayor's driveway on the east side of Rio Grande Boulevard.  (*Id.*, UF ¶ 48.)  She was standing at least six or seven feet back from the edge of the road, near a line of trees that appeared to demarcate the shoulder from private property.  (*Id.*)  A few other protestors, including Plaintiff Mary Lou "Mitzi" Kraft, Plaintiff Laura Lawrence, and Ms. Lawrence's young daughter, gathered with her on the eastern shoulder of Rio Grande Boulevard to the north of the Mayor's driveway. (*See id.*, UF ¶ 48, Pahls Decl. ¶¶ 14, 16.)  This section of the shoulder of the road was outside the security perimeter.  (*See id.*, Ex. D at 22 & Ex. G at 74-75.)

At some point prior to the President's arrival, a BCSD officer approached Ms. Pahls and told her she could not stand there.  (*Id.*, Pahls Decl. ¶ 18.)  She informed him that another BCSD officer had given her permission to stand there.  (*Id.*)  Five or ten minutes later, more BCSD officers came and forced Ms. Pahls and her three companions to move south.  (*Id.*, Pahls Decl. ¶ 19.)  One of the

14

BCSD officers adamantly told them that they needed to move at that moment. (*Id.*) This group then moved to the south with the rest of the protestors because they felt the officers might use force if they resisted them. (*Id.*)

A smaller group of supporters of President Bush[4] gathered on property directly across from the Mayor's driveway in the area where Ms. Pahls originally tried to stand before a BCSD officer told her to move. (*See id.*, Pahls Decl. ¶ 21.) Several of the supporters were holding American flags and two individuals held a banner saying "God Bless George Bush! We pray for you!" (*See* Pls.' Resp. to Def. Sheehan's Mem. (Doc. 136), Decl. of Will Plotner, Jr., at Ex. B.)

At some point prior to President Bush's arrival, an individual who identified himself as a landowner who resided on Rio Grande Boulevard across the street from the Mayor's driveway approached Special Agent Sheehan. (*See* Def. Sheehan's Mem. (Doc. 133), UF ¶ 26.) The man asked if he was allowed to stand on the portion of his property on the edge of Rio Grande Boulevard to watch the motorcade as it passed. (*Id.*, UF ¶ 27.) After determining that the landowner did not display any threatening or injurious behavior, Special Agent Sheehan responded that law enforcement would not interfere with his property rights so long as he did not interfere with the motorcade route or make any overt actions while the motorcade passed. (*See id.*, UF ¶ 28; Defs.' Thomas and Mims' Mem. (Doc. 142), UF ¶ 31.) Law enforcement officers were posted in front of the supporters for safety purposes. (*See* County Defs.' Mem. (Doc. 94), Ex. C at 52; Defs. Thomas and Mims' Mem. (Doc. 142), Ex. D at 29.)

---

[4]For ease of reference, the Court will use the term "supporters" to refer to the pro-Bush demonstrators and "protestors" or "demonstrators" to refer to the anti-Bush demonstrators.

A Secret Service agent who ran the site survey[5] informed Lt. Thomas and Sgt. Mims that there were going to be some people right across the roadway on private property. (*See* Pls.' Resp. to Defs. Thomas and Mims' Mot. (Doc. 147), Ex. D at 38-39.) Lt. Thomas responded, "Fine," because of his belief that a citizen has a right to be on his or her private property. (*See* County Defs.' Mem. (Doc. 94), Ex. A at 39-41.) Lt. Thomas, however, did not actually see the supporters so he did not know how far from the road they were standing. (*See* Pls.' Resp. to County Defs.' Mem. (Doc. 99), Ex. A at 40.) He instead relied on what the Secret Service told him – that the supporters would be on their private property. (*See* County Defs.' Mem. (Doc. 94), Ex. A at 41-43.)

When Sgt. Mims was informed about the supporters' request to stand on private property, he was not in the same area as the supporters. (*See* Defs. Thomas and Mims' Mem. (Doc. 142), Ex. D at 38-39.) Sgt. Mims, however, did speak with the supporters on more than one occasion that day, told his chain of command that they were there, and told the supporters that as long as they stayed on their own property, they would be permitted to stay. (*See* Pls.' Resp. to Defs. Thomas and Mims' Mot. (Doc. 147), Ex. E at 27-28.) Sgt. Mims believed, based on the orders he received, that protestors could also have stood on private property if they had been given permission by someone who lived on the property. (*See* Defs. Thomas and Mims' Reply in Supp. of Mot. for Summ. J. (Doc. 150), Ex. M at 41.)

The supporters stood on or near the shoulder of the road, somewhere approximately six and 15 feet from the road. (Pl.'s Resp. to County Defs.' Mem. (Doc. 99), Pahls Decl. ¶ 22.)[6] The private

_____

[5]The record is not clear as to whether or not this Secret Service agent was Special Agent Sheehan.

[6]Ms. Pahls declared that, although she could only see the flags the supporters were carrying, they "must have been standing near the shoulder of the road at that point, because otherwise [she] would not have been able to see the tops of the flags from where [she] was

property line at the approximate location where supporters were standing is 8.9 feet from the edge

of the pavement of Rio Grande Boulevard.  (*See* Pls.' Resp. to Def. Sheehan's Mot. (Doc. 136),

Decl. of Will Plotner, Jr., ¶¶ 2-4.)[7]  The supporters stood on private property during at least part of

---

standing." (Pl.'s Resp. to County Defs.' Mem. (Doc. 99), Pahls Decl. ¶ 22.)  Ms. Pahls stated
that she "believed they would have been standing in the area where the man is standing in the
photograph in Exhibit B: either right on the shoulder of the road or about six feet or closer from
the road."  (*Id.*)  Based on her explanation, the Court finds that she has sufficient personal
knowledge on which to base her statement that the supporters were on or near the shoulder of the
road.  As to the supporters' exact distance from the road, her testimony is confusing.  She
estimates that the supporters were either right on the shoulder or six feet or closer from the road.
However, she also testifies that they were standing in the area where the man is standing in
Exhibit B.  From the photograph in Exhibit B, the man's location appears to be at a greater
distance than six feet from the road, possibly as far as 15 feet from the side of the road.
Construing the evidence in Plaintiffs' favor, the Court finds that Plaintiffs have some evidence
that the supporters were standing somewhere within the range of six to fifteen feet from the road.

[7]Defendants Thomas and Mims assert in their reply that the Court should strike the
Declaration of Will Plotner, Jr., from the record because Plaintiffs did not attach the document to
their response to Defendants Thomas and Mims's motion for summary judgment and because
Plaintiffs had not previously disclosed Mr. Plotner as a witness.  Plaintiffs filed a motion for
leave to file a surreply to address these issues.  Because the issues discussed in the surreply and
in Defendants Thomas and Mims's response thereto are pertinent to the issues raised in the
motion for summary judgment, the Court will grant Plaintiffs' motion to file the surreply.

    With respect to the issue of not attaching the Declaration to their response to Defendants
Thomas and Mims's motion, Plaintiffs attached Mr. Plotner's Declaration in support of their
Opposition to Defendant Sheehan's Motion for Summary Judgment (Doc. 136) that they filed on
September 30, 2010.  In their response to Defendants Thomas and Mims's motion, Plaintiffs
referenced the previously filed exhibit in accordance with New Mexico Local Rule 10.7.  *See*
N.M. Local R. of Civ. P. 10.7 ("An exhibit should be submitted only once and may later be
referred to by document title and filing date.").  The failure to attach the Declaration in this
round of briefing is thus not grounds for striking it.

    As for the disclosure issue, Rule 26(a)(2)(C) requires expert disclosure in accordance
with any court order, and in the absence of a court order, "at least 90 days before the date set for
trial."  Fed. R. Civ. P. 26(a)(2)(C) (2010).  Although the Court initially set an expert disclosure
date of May 22, 2008 (Doc. 22), that date was vacated by subsequent orders.  No specific expert
disclosure date was set by the Court because the parties indicated that they did not intend to use
any expert witnesses.  No trial date has yet been scheduled in this case.  Nevertheless, the Court
did give a termination date for discovery, which arguably encompasses Rule 26(a)(2)
disclosures. (*See* Order (Doc. 84) (setting December 3, 2009, as termination date for discovery).)
There is thus an open question as to whether the disclosure was untimely.  The Court need
resolve this issue, however, because Defendants will not suffer any prejudice from the Court's

the August 27, 2007 Presidential visit. (*See* County Defs.' Mem. (Doc. 94), Ex. E at 27-29, Ex. F at 14; Defs. Thomas and Mims' Mem. (Doc. 142), Ex. G at 101, 103.)

At the time the perimeter "hardened," the supporters were located on either the edge of the private property line or on the public shoulder across the street from the Mayor's driveway.[8] (*See* Pl.'s Resp. to County Defs.' Mem. (Doc. 99), Pahls Decl. ¶ 22, Ex. D at 66-67, & Ex. L at 35-36; County Defs.' Mem. (Doc. 94), Ex. E at 27-29.) This area has a wide shoulder consisting of a tarmac shoulder and a gravel shoulder. (Pls.' Resp. to County Defs.' Mem. (Doc. 99), UF ¶ 58.) The shoulder then slopes down to an open field and there is no fence demarcating the shoulder from the field. (*Id.*) Although BCSD officers did not have a specific survey to establish the exact location of the private property line, they believed that the supporters stood on private property because they were not directly on the road and stood more on the grass. (*See id.*, Ex. D at 66-67 & Ex. E at 36.) Sgt. Mims guessed that the public shoulder was approximately 10 to 15 feet wide, and he believed, based on that estimate, that the area where the supporters were standing was private property. (*See id.*, Ex. D at 66-67.) Special Agent Sheehan likewise understood that the supporters were on private property. (Defs. Thomas and Mims' Mem. (Doc. 142), Ex. G at 101.)

---

consideration of the Declaration at this summary judgment stage. As discussed *infra*, the Court's analysis does not rely on Mr. Plotner's survey results. The Court will therefore not strike the Declaration at this time. Nor will the Court resolve at this juncture the admissibility of Mr. Plotner's testimony at trial.

[8]Ms. Pahls's estimate of where the supporters were standing is based on where the man is standing in the photograph attached as Exhibit B to her Declaration. (*See* Pl.'s Resp. to County Defs.' Mem. (Doc. 99), Pahls Decl. ¶ 22.) As discussed *supra* in footnote 6, the man appears to be standing on or very near the private property line, as the distance could be between six feet, which would be on public property, or more than 8.9 feet from the road, which would be on private property. Based on the evidence provided by Plaintiffs and construed in their favor, the Court finds that there is some evidence indicating that Plaintiffs may have been standing on public property when the perimeter hardened. There is therefore a dispute of fact on this issue.

Approximately 30 minutes prior to the President's arrival, according to standard protocol, law enforcement "hardened" the perimeter.  (County Defs.' Mem. (Doc. 94), UF ¶ 23 & Ex. G at 26; Pls.' Resp. to County Defs.' Mem. (Doc. 99), Pahls Decl. ¶ 20; Defs. Thomas and Mims' Mem. (Doc. 142), UF ¶ 45.)  Personnel from APD blocked Rio Grande Boulevard with marked vehicles. (*See* County Defs.' Mem. (Doc. 94), Ex. G at 26; Pls.' Resp. to County Defs.' Mem. (Doc. 99), Pahls Decl. ¶ 20.)  Officers on horseback were also stationed across Rio Grande Boulevard, about 150 yards south of the Mayor's driveway.  (*See* Pls.' Resp. to County Defs.' Mem. (Doc. 99), Pahls Decl. ¶ 20 & Moffitt Decl. ¶¶ 14-15, 17.)  The horses were large, blocking the northern view of the demonstrators standing at the southern checkpoint.  (*See id.*, UF ¶ 52.)  No vehicular or pedestrian traffic was allowed through the barricade once the perimeter hardened.  (Defs. Thomas and Mims' Mem. (Doc. 142), UF ¶ 47.)  The purpose of stopping traffic was to ensure the safety of President Bush and the officers on motorcycles, so that nobody could step out in front of them or throw something.  (*See* County Defs.' Mem. (Doc. 94), Ex. F at 13; Pls.' Resp. to County Defs.' Mem. (Doc. 99), Ex. C at 44;  Defs. Thomas and Mims' Mem. (Doc. 142), UF ¶ 48.)  Once the southern barricade was in place, officers told the demonstrators to form a line behind and parallel to the barricade and not to step north of the line.  (*See* Pls.' Resp. to County Defs.' Mem. (Doc. 99), Moffitt Decl. ¶ 15 & Pahls Decl. ¶ 20.)  There were at least 70 protestors at that point.  (*Id.*, Moffitt Decl. ¶ 15.)  Sometime after officers stopped vehicular traffic on the road, Officer Ficke stopped pedestrians who were trying to walk north on the shoulder of the road.  (*See* Pls.' Resp. to Def. Sheehan's Mem. (Doc. 136), Ex. B at 11.)

At around noon, the President's motorcade approached Mayor Abraham's residence from the north and entered the driveway.  (*See* Defs. Thomas and Mims' Mem. (Doc. 142), UF ¶ 49.)  The motorcade never passed by Plaintiffs and the others demonstrators standing to the south of the

residence.  (*See* Pl.'s Resp. to County Defs.' Mem. (Doc. 99), Pahls Decl. ¶ 23.)  The President's view of the demonstrators and their signs was obstructed and obscured by the distance, parked police cars, and officers on horseback.  (*See id.*, Pahls Decl. ¶¶ 20, 24.)  In contrast, the supporters of the President had an unobstructed view of the passing motorcade.  (*See id.*, Pahls Decl. ¶ 25.)  From the moment President Bush arrived at the Mayor's residence until his departure, Special Agent Sheehan remained in close proximity to the President.  (*See* Def. Sheehan's Mem. (Doc. 133), Ex. A ¶ 11.)

The majority of protestors stayed until 15 minutes after the President entered Mayor Abraham's residence for the fund raiser.  (Defs. Thomas and Mims' Mem. (Doc. 142), UF ¶ 50.) During the demonstration, various media outlets parked and/or passed by the anti-Bush demonstrators.  (*See* County Defs.' Mem. (Doc. 94), Ex. H at 23, 35 & Ex. I at 34-35.)  The day after the Presidential visit, an article appeared in the Albuquerque Journal regarding the protest. (Defs. Thomas and Mims' Mem. (Doc. 142), UF ¶ 53.)

Special Agent Sheehan states that he did not tell anyone to remain on any portion of Rio Grande Boulevard and that he did not order anyone to move from the northern portion of Rio Grande Boulevard to the southern portion.  (*See* Def. Sheehan's Mem. (Doc. 133), Ex. A ¶ 13.)  He also asserts that he did not direct any law enforcement personnel or any other person to prohibit demonstrators, versus the public in general, from entering any portion of Rio Grande Boulevard. (*Id.*)  Additionally, Special Agent Sheehan avows that he did not direct anyone as to where protestors should be located, and that his decisions were made exclusively to protect the safety of the President without any consideration of any particular group's or individual's viewpoint or any desire to impair the effectiveness of any demonstrations against President Bush.  (*See id.*, Ex. A ¶¶ 10, 13.)  Special Agent Sheehan testified that, if protestors were standing on the same private property as supporters, he would have treated them the same.  (*See id.*, Ex. B at 102, 106.)  Plaintiffs

argue that there is sufficient evidence in the record to contradict his self-serving statements regarding his state of mind and to create an issue of fact for the jury that Special Agent Sheehan – by his own actions and those of other officers working under his supervision – treated demonstrators and supporters differently based on their viewpoint.

On September 13, 2010, Defendant Sheehan filed a motion for summary judgment based on qualified immunity (Doc. 132) on Plaintiffs' First and Fourteenth Amendment claim. Defendant Sheehan argues that he is entitled to qualified immunity because the facts do not support Plaintiffs' argument that he designated a particular area for protestors or supporters as part of his overall security plan, or that he forced Plaintiffs to stay in an area 150 yards south of the driveway, or that he instructed local law enforcement to prevent them from moving north of the southern checkpoint towards the Mayor's house. Defendant Sheehan contends that any decisions he made to restrict public access to the event were content-neutral and reasonable under the First Amendment.

Subsequently, on November 15, 2010, Defendants Thomas and Mims filed a motion for summary judgment based on qualified immunity (Doc. 141). Defendants Thomas and Mims similarly argue that Plaintiffs have not shown that they were personally involved in any constitutional violations. They assert that their status as supervisors does not constitute a basis upon which to hold them personally responsible for any constitutional violations of their subordinates. They further contend that their order to keep protestors in one group for safety purposes was a viewpoint-neutral restriction, narrowly tailored to serve the significant government interest of the safety of the President and public. Defendants Thomas and Mims assert that, regardless of content, all speech was restricted to the area outside the secure perimeter.

Plaintiffs counter that Defendants enforced the security perimeter in a viewpoint discriminatory manner. They assert that Defendants can be held liable for the differential treatment

based on their direct, personal involvement and because the subordinate law enforcement officers were acting under the direct orders and supervision of Defendants Sheehan, Thomas, and Mims.

## III.    STANDARD

Under the doctrine of qualified immunity, "government officials performing discretionary functions generally are shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982).  When a defendant raises the qualified immunity defense on summary judgment, the burden shifts to the plaintiff to meet a strict two-part test.  *See Nelson v. McMullen*, 207 F.3d 1202, 1206 (10th Cir. 2000).  The plaintiff must demonstrate that (1) the defendant violated a constitutional or statutory right and (2) the right was clearly established at the time of the conduct.  *Id.*  As to the first inquiry, the question is whether the facts alleged, which are taken in the light most favorable to the party asserting the injury, the officer's conduct violated a constitutional right.  *See Olsen v. Layton Hills Mall*, 312 F.3d 1304, 1312 (10th Cir. 2002).  The second inquiry is more specific than whether the officer's conduct violated a constitutional right – the question is whether it would be clear to a reasonable officer that his conduct was unlawful under the circumstances he confronted.  *Saucier v. Katz*, 533 U.S. 194, 202 (2001).  "[T]he right allegedly violated must be defined at the appropriate level of specificity before a court can determine if it was clearly established."  *Wilson v. Layne*, 526 U.S. 603, 615 (1999) (citing *Anderson v. Creighton*, 483 U.S. 635, 641 (1987)).  Moreover, "in order for the law to be clearly established, there must be a Supreme Court or Tenth Circuit decision on point, or the clearly established weight of authority from other courts must have found the law to be as the plaintiff maintains."  *Currier v. Doran*, 242 F.3d 905, 923 (10th Cir. 2001) (quoting *Medina v. City & County of Denver*, 960 F.2d 1493, 1498 (10th Cir. 1992).  A plaintiff need not have a case with

22

exact corresponding factual circumstances, as defendants must make reasonable applications of the prevailing law to their own circumstances. *Id.*

If the plaintiff establishes both elements of the qualified immunity test, then the burden shifts back to the defendant to show there are no genuine issues of material fact and that he is entitled to judgment as a matter of law. *Nelson*, 207 F.3d at 1206. Summary judgment is appropriate only if "'the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law.'" *Quaker State Minit-Lube, Inc. v. Fireman's Fund Ins. Co.*, 52 F.3d 1522, 1527 (10th Cir. 1995) (quoting Fed. R. Civ. P. 56(c)). "All facts and reasonable inferences must be construed in the light most favorable to the nonmoving party." *Id.* (internal quotations omitted).

## IV.   ANALYSIS

### A.   First Amendment

It has long been established that public places historically associated with the free exercise of expressive activities, such as streets and sidewalks, are considered to be public fora. *United States v. Grace*, 461 U.S. 171, 177 (1983); *Citizens for Peace in Space v. City of Colorado Springs*, 477 F.3d 1212, 1219 (10th Cir. 2007) ("The public streets and sidewalks encompassed by the security zone are traditional public forums."). For traditional public fora, reasonable time, place, and manner restrictions are constitutional if (1) they are content-neutral; (2) they are narrowly drawn to achieve a significant governmental interest; and (3) there are ample alternative channels for communication of the desired message. *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (1989); *Mesa v. White*, 197 F.3d 1041, 1045 (10th Cir. 1999). Content-neutral regulations must be narrowly tailored to serve the government's legitimate interests, but they need not be the least restrictive or

least intrusive means of doing so. *Ward*, 491 U.S. at 798. Instead, the content-neutral regulation will meet the narrow tailoring requirement so long as it promotes a substantial government interest that would be achieved less effectively absent the regulation. *Id.* at 799.

In contrast, "[i]t is well established law that 'content-based restriction on political speech in a public forum . . . must be subjected to the most exacting scrutiny." *Mahoney v. Babbitt*, 105 F.3d 1452, 1455 (D.C. Cir. 1997) (quoting *Boos v. Barry*, 485 U.S. 312, 321 (1988)) (emphasis omitted). *See also City of Los Angeles v. Alameda Books, Inc.*, 535 U.S. 425, 434 (2002) ("If the regulation were content based, it would be considered presumptively invalid and subject to strict scrutiny."); *R.A.V. v. City of St. Paul*, 505 U.S. 377, 382 (1992) ("Content-based regulations are presumptively invalid."). The government must show that a content-based restriction is necessary to serve a compelling governmental interest and that it is narrowly drawn to achieve that end. *Perry Ed. Assn. v. Perry Local Educators' Assn.*, 460 U.S. 37, 45 (1983); *Mahoney*, 105 F.3d at 1455. "Viewpoint-based restrictions receive even more critical judicial treatment." *Mesa*, 197 F.3d at 1047 (quoting *Church on the Rock v. City of Albuquerque*, 84 F.3d 1273, 1279 (10th Cir. 1996)). First Amendment law forbidding viewpoint-based restrictions on speech was thus clearly established at the time of the event and would put a reasonable official on notice that disparate treatment of protestors based on their viewpoint was unlawful. *See*, *e.g.*, *Mesa*, 197 F.3d at 1047; *Mahoney*, 105 F.3d at 1455.

A plaintiff asserting a First Amendment violation has the burden to prove that the restrictions affect protected expression in a traditional public forum. *American Civil Liberties Union of Colorado v. City and County of Denver*, 569 F.Supp.2d 1142, 1161 (D. Colo. 2008). Once the plaintiff satisfies that burden, the burden shifts to the government to prove the constitutionality of its actions. *Id.* (citing *United States v. Playboy Entertainment Group, Inc.*, 529 U.S. 803, 816 (2000)).

24

Here, Plaintiffs have established that they were restricted from protesting across from and north of the Mayor's driveway on public shoulders and on private property in view of the President's motorcade. Evidence in their favor shows that they and their signs were not visible to the Presidential motorcade. Plaintiffs have thus shown that the restrictions affected protected expression in a traditional public forum. The fact that their presence may have been visible to the media, while perhaps diminishing the degree to which Plaintiffs' rights were affected, does not disprove that the restrictions affected Plaintiffs' First Amendment rights because the intended target of the protest was the President himself. Consequently, the burden shifts to the Government to show that the restriction was constitutional.

To determine whether a restriction is content-neutral, courts must focus on the government's purpose in imposing the restriction. *Ward*, 491 U.S. at 791. "A regulation that serves purposes unrelated to the content of expression is deemed neutral, even if it has an incidental effect on some speakers or messages but not others." *Id.* If the restriction is justified without reference to the content of the regulated speech, then the restriction is considered content-neutral. *See id.* at 791-92.

The evidence construed in Plaintiffs' favor shows that law enforcement at the event interfered with the protestors' rights to demonstrate on the public shoulder across from and to the north of the Mayor's driveway and to go to private property north of the Mayor's driveway. In contrast, law enforcement did not interfere with the pro-Bush supporters' demonstration across from the Mayor's driveway, in view of the Presidential motorcade. Defendants contend that security concerns prompted keeping demonstrators in one group, that they chose the southern perimeter as a location for demonstrators because the majority of demonstrators voluntarily gathered there, and that the pro-Bush supporters were permitted to remain in a separate group across the street from the Mayor's driveway solely because they were on private property.

25

Plaintiffs, however, have provided evidence suggesting that the proffered private property and security reasons are pre-textual.  Many of the protestors initially "gathered" at the southern perimeter because law enforcement indicated to them that the southern perimeter was the only location permitted for demonstrating.  Additionally, there is evidence indicating that the eastern public shoulder of Rio Grande Boulevard was outside the security perimeter, yet a BCSD officer forced Plaintiffs Pahls, Kraft, and Lawrence, who were standing on that public shoulder near where the pro-Bush supporters were allowed to stand, to move south.  Defendants have shown no evidence that these women posed any security risk or that any other permissible reason required them moving from the area outside the security perimeter where pro-Bush supporters were permitted to demonstrate.  To the contrary, Special Agent Sheehan admitted that, from a security standpoint, there was no reason to prevent demonstrators from walking north of the southern checkpoint along the eastern side of Rio Grande Boulevard.  (*See* Pls.' Resp. to Def. Sheehan's Mot. (Doc. 136), Ex. I at 109.)

Even if the pro-Bush supporters were permitted to stand on or near their private property because law enforcement believed they were standing on private property, Defendants have proffered no legitimate reason as to why the anti-Bush protestors could not stand near the pro-Bush supporters on the adjacent public shoulder.  The security reason given for wanting the public in one group does not explain why anti-Bush protestors could not demonstrate on the public shoulder by the separate group of pro-Bush supporters.  Not only were law enforcement officers stationed in front of the supporters at that location, but there is evidence indicating that the public shoulder at that location, like the private property, was outside the security perimeter.[9]  Furthermore, when

[9]Plaintiffs assert that the exact location of the private property line is significant.  The Court disagrees.  Officers need not know the exact survey lines along an entire motorcade route

26

viewed in light of the evidence that a BCSD officer disallowed protestors from entering a van to go to private property farther north, a reasonable jury could disbelieve Defendants' purported non-discriminatory reasons for the disparate treatment of supporters and protestors. A reasonable jury could instead conclude, based on the actions of law enforcement officers, that law enforcement harbored a discriminatory motive to target the anti-Bush demonstrators because of their message. *Cf. Moss v. U.S. Secret Service*, __ F.Supp.2d __, 2010 WL 4450407, *14-15 (D. Or. Oct. 29, 2010) (holding that plaintiffs alleged sufficient facts to show impermissible motive that Secret Service agents targeted anti-Bush demonstrators because of their speech where all people within explosive range of President posed same threat but only those who expressed anti-Bush message were relocated farther from motorcade route).[10]

Furthermore, these same facts create a question of fact as to whether the restrictions on where anti-Bush protestors could stand were necessary to serve a compelling governmental interest and that they were narrowly drawn to achieve that end. Although security of a President is certainly a compelling governmental interest, there is evidence in the record indicating that the specific

_____

in order to make distinctions between private and public property along that route. Officers are not expected to have expert knowledge in surveying; nor are they expected to have measuring tapes at their ready disposal to make sure protestors stay within private or public property bounds. Rather, what is significant is whether the officers' belief as to where the private property line is located is reasonable, and whether the officers applied any private versus public property distinctions in a viewpoint-neutral manner. The Court's analysis thus does not rely on Mr. Plotner's survey results.

[10]The evidence of viewpoint discrimination, construed in Plaintiffs' favor, distinguishes this case from *Citizens for Peace in Space v. City of Colorado Springs*, 477 F.3d 1212 (10th Cir. 2007), a case heavily relied upon by Defendants. In *Citizens for Peace*, the plaintiffs conceded that the city's restriction was content neutral and the Tenth Circuit found no reason to disagree because the city implemented a total ban on public expression within the security zone, regardless of the identity of the speaker or the subject of the message. *See id.* at 1220. In contrast, Plaintiffs in this case have presented evidence that Defendants implemented the security zone restriction differently for pro-Bush and anti-Bush demonstrators.

restrictions imposed did not actually serve that security interest.  *Cf. Citizens for Peace*, 477 F.3d at 1221 (noting that, for content-neutral restrictions, it is not enough that defendant justifies its restrictions based broadly on "security;" rather, question of narrow tailoring must be decided against backdrop of harms for which a *particular* set of security measures are designed).  For example, there is evidence that the areas north of the southern checkpoint, where many of the protestors wanted to stand, were outside the security perimeter.  A reasonable jury could also find that the proffered manpower concern for keeping protestors in one group to the south of the southern perimeter was pretextual, given the evidence that there was enough manpower to station a separate group of law enforcement officers in front of pro-Bush supporters in the same place where anti-Bush protestors attempted to stand.  Plaintiffs also have evidence that additional officer manpower was present at the event but went unused.  There is therefore a question of fact as to whether the Government can meet the exacting scrutiny required for the purported viewpoint-based restrictions.  *Cf. Citizens for Peace*, 477 F.3d at 1223 ("The City is not obliged to show, under the narrowly tailored analysis, that it was impossible to increase officer presence to accommodate the protestors.  *This is a burden akin to that required in strict scrutiny cases*.") (emphasis added).

In summary, this Court concludes that there is a question of fact as to whether Plaintiffs' First Amendment rights were violated.  This conclusion does not resolve the motions at hand, however, because Defendants argue that any viewpoint-discriminatory inferences to be drawn from the manner in which individual subordinate officers executed the security orders should not be attributed to them.  The Court must therefore determine whether Plaintiffs can prove that Defendants Sheehan, Thomas, and Mims can be held personally liable for any First Amendment violations.

## B.     Personal Liability

Because the doctrine of respondeat superior does not apply to § 1983 claims, a plaintiff must

show that each government-official defendant, through the official's own individual actions, violated

the Constitution. *Ashcroft v. Iqbal*, 129 S.Ct. 1937, 1948 (2009). To impose liability, each

government official must have the requisite state of mind required to establish a violation of the

constitutional provision; mere knowledge and acquiescence in their subordinates' discriminatory

purpose does not amount to the supervisor violating the Constitution. *See id.* at 1949.

Consequently, to succeed on their First Amendment viewpoint discrimination claim, Plaintiffs must

show that each defendant "ordered the relocation of their demonstration *because of* [,] not merely

in spite of, the demonstration's anti-Bush message." *See Moss v. U.S. Secret Service*, 572 F.3d 962,

970 (9th Cir. 2009).

The Tenth Circuit recently analyzed *Iqbal*'s "stricter liability standard." *See Dodds v.

Richardson*, 614 F.3d 1185, 1199 (10th Cir. 2010). The Tenth Circuit concluded that, "[w]hatever

else can be said about *Iqbal*," at least one form of liability against defendant-supervisors survives:

> § 1983 allows a plaintiff to impose liability upon a defendant-supervisor who creates,
> promulgates, implements, or in some other way possesses responsibility for the
> continued operation of a policy the enforcement (by the defendant-supervisor or her
> subordinates) of which subjects, or causes to be subjected that plaintiff to the
> deprivation of any rights . . . secured by the Constitution . . . . A plaintiff may
> therefore succeed in a § 1983 suit against a defendant-supervisor by demonstrating:
> (1) the defendant promulgated, created, implemented or possessed responsibility for the
> continued operation of a policy that (2) caused the complained of constitutional
> harm, and (3) acted with the state of mind required to establish the alleged
> constitutional deprivation.

*Id.* (internal quotations omitted). The Tenth Circuit further clarified that "defendant-supervisors

may be liable under § 1983 where an 'affirmative' link exists between the unconstitutional acts by

their subordinates and their 'adoption of any plan or policy . . . – express or otherwise – showing

their authorization or approval of such misconduct.'" *Id.* at 1200-01 (quoting *Rizzo v. Goode*, 423

U.S. 362, 371 (1976)). The Court will therefore consider these liability standards when determining

29

whether there is enough evidence against each Defendant for a reasonable jury to find each liable for the alleged First Amendment violations.

### 1.    Lieutenant Thomas

It is undisputed that Defendant Thomas was the BCSD commander in charge of the site security, and he, along with the Secret Service and APD, helped develop the security plan for the event.  He acted as the point of contact and immediate supervisor of all local police officers assigned to duty at the event.  He directly supervised his officers' conduct while on-site throughout the protest.  Furthermore, the evidence in Plaintiffs' favor shows that, although the Secret Service was in charge of the overall event, BCSD and Defendant Thomas in particular had considerable discretion and control over the placement and overall management of all demonstrators.

There is also evidence that he ordered the officers under his command to keep the demonstrators in one group south of the southern perimeter, yet he knowingly acquiesced in the decision not to interfere with the pro-Bush supporters who remained on or near their private property during the event.  Although Defendant Thomas may not have specifically ordered his officers to force the demonstrators who were protesting near the pro-Bush supporters on a public shoulder outside the security perimeter to move to the south, a reasonable jury could find, based on all the evidence, that Defendant Thomas's order to keep the demonstrators at the southern perimeter indicated that he contemplated exactly the actions taken by his subordinates.  For instance, following the briefing, at least one officer understood Defendant Thomas's order to mean that all demonstrators must be moved to the southern perimeter, including a protestor invited by a property owner to protest on private property north of the barricade.  This evidence indicates that the subordinate BCSD officer's subsequent refusal to permit anti-Bush protestors to get into the van that was going to private property north of the southern perimeter was done pursuant to Defendant

Thomas's orders.

Although Defendant Thomas may have deferred to Special Agent Sheehan's instruction that the pro-Bush supporters could remain on their private property, that fact alone does not absolve Defendant Thomas of potential liability.  There is evidence that Defendant Thomas issued orders that caused his subordinate officers to not allow Plaintiffs to stand on public shoulders near the entrance to the Mayor's driveway or to protest on private property to the north of the Mayor's driveway, areas outside the security perimeter where they had a right to demonstrate.  It is that disparate treatment, over which Defendant Thomas had direct control, that is the basis of his potential liability.

For the foregoing reasons, the Court finds that the facts in Plaintiffs' favor could establish that Defendant Thomas promulgated, created, implemented, or possessed responsibility for the policy that caused the restrictions on Plaintiffs' speech because of their anti-Bush message.  Because the Court concludes that Plaintiffs have demonstrated an affirmative link between Defendant Thomas and the viewpoint discriminatory practices sufficient to present their case to a jury, the Court will deny Defendant Thomas's motion for qualified immunity and summary judgment.  *Cf. Buck v. City of Albuquerque*, 549 F.3d 1269, 1280 (10th Cir. 2008) (holding that plaintiffs established requisite causal connection between alleged deprivation of constitutional rights and incident commander's actions, where commander was in charge of police response to demonstration, was immediate supervisor and point of contact for officers assigned to duty at demonstration, directly supervised his officers' conduct, and personally issued orders for arrests).

### 2.    Sergeant Mims

For similar reasons, the Court will deny Defendant Mims's motion for qualified immunity and summary judgment.  Defendant Mims was the ERT supervisor whose responsibility was the

security of the outer perimeter.  He had the authority to allow demonstrators through the perimeter. Defendant Mims gave the briefing during which officers were instructed to move all protestors to the southern perimeter.  He also knew of and did not interfere with the pro-Bush supporters' demonstration across from the Mayor's driveway.  Given his active involvement in ordering the placement of demonstrators at the event, the inference of viewpoint discrimination that may be drawn from the manner in which his subordinate officers carried out their instructions can be ascribed to him.  The Court therefore concludes that the facts, as viewed in the light most favorable to Plaintiffs, are sufficient to establish that Defendant Mims promulgated, created, implemented, or possessed responsibility for the policy that caused the restrictions on Plaintiffs' speech because of their anti-Bush message.

### 3.    Special Agent Sheehan

Special Agent Sheehan was responsible for site security at the Mayor's residence, and he was the site agent for the overall security plan for President Bush's visit.  His on-site duty was supervising and monitoring the secure perimeter at the Mayor's house.  Special Agent Sheehan knew of and did not interfere with the pro-Bush supporters' demonstration across from the Mayor's driveway.  Together with BCSD and APD personnel, Special Agent Sheehan put in place the security checkpoints to restrict access to portions of Rio Grande Boulevard, including the southern checkpoint.  Although there is no evidence that Special Agent Sheehan specifically ordered local law enforcement to forbid protestors from moving north to private property or to force protestors south from the public shoulder across from the Mayor's driveway, he participated in the briefing where Sgt. Mims instructed law enforcement officers to keep demonstrators to the south of the Mayor's residence.  At least one officer left that briefing with the understanding that the order meant that all demonstrators must be moved to the southern perimeter, even a protestor invited by an owner

to protest on private property north of the barricade.  Given that other BCSD officers enforced the order in that same manner and two Secret Service agents ordered APD not to allow anyone north of the southern perimeter, it is reasonable for a jury to infer that the officers were executing the order in the manner intended by the superiors who issued and/or approved it.

These facts, as construed in Plaintiffs favor, create a question of fact as to whether Special Agent Sheehan is liable for the alleged First Amendment violation.  Although Special Agent Sheehan did not personally instruct the local officers at the briefing to keep protestors south of the southern checkpoint, he participated at the briefing and was the agent with ultimate responsibility for the security at the Mayor's residence.  At this meeting, federal and local law enforcement planned for the Presidential visit, and the Secret Service decided where the perimeters were and advised local law enforcement of what was or was not acceptable in connection with establishing the secure zone and/or perimeter.  These facts suggest that he promulgated, created, implemented or possessed responsibility for the continued operation of the order that caused differential treatment of anti-Bush and pro-Bush demonstrators, satisfying the first and second requirements for liability.

The third requirement to impose liability – that he acted with the state of mind required to establish the alleged First Amendment deprivation – presents a closer question.  The evidence construed in Plaintiffs' favor indicates that he participated in the briefing after which multiple officers left with the understanding that all demonstrators must be moved to the southern perimeter, including protestors standing on public shoulders outside the security perimeter and protestors invited by a property owner to protest on private property north of southern checkpoint.  The subordinate officers' subsequent execution of the order in a manner that treated anti-Bush protestors differently from pro-Bush supporters, resulting in their anti-war and anti-Bush message not being able to be seen by the Presidential motorcade, suggests that the supervisors in charge of issuing and

33

approving that order, including Special Agent Sheehan, intended the differential treatment of protestors and supporters that occurred.  Again, although there are content-neutral security reasons for establishing a security perimeter, Plaintiffs have submitted sufficient evidence to indicate that the way in which officers enforced the security perimeter was done in a content-discriminatory way.  In sum, the Court finds that there is sufficient evidence of an affirmative link between the disparate treatment of the anti-Bush protestors and the pro-Bush supporters by subordinate officers and Special Agent Sheehan's adoption of the order showing his authorization or approval of such misconduct.  The Court will therefore deny Defendant Sheehan's motion for summary judgment and qualified immunity.

### C.  Fourteenth Amendment

Plaintiffs are clearly not asserting a separate Fourteenth Amendment claim; rather, they invoke the Fourteenth Amendment "because the Fourteenth Amendment incorporates the First Amendment and makes it applicable to the states."  (Pls.' Resp. to Defs. Thomas & Mims' Mot. (Doc. 147) at 24 n.2.)  This Court similarly does not construe Plaintiffs' Amended Complaint as stating a separate Fourteenth Amendment equal protection or due process claim.  The Court therefore need not grant summary judgment to Defendants on a non-existent Fourteenth Amendment equal protection or due process claim.

**IT IS THEREFORE ORDERED** that

1.     Plaintiffs' Motion for Leave to File Surreply in Opposition to Defendants Thomas and Mims' Motion for Summary Judgment (**Doc. 151**) is **GRANTED**;

2.     Defendant Kerry Sheehan's Motion for Summary Judgment based on Qualified Immunity (**Doc. 132**) is **DENIED**; and

34

3.       Defendant Matthew Thomas's and Defendant Edward Mims's Motion for Summary

Judgment (**Doc. 141**) is **DENIED**.


**SENIOR UNITED STATES DISTRICT JUDGE**